08,979-04 (P.1-of-2)

This document contains some pages that are of poor quality at the time of imaging.

# List Of Attachments

#①. Motion Requesting The State Waive It's Exhaustion Requirements (To Facilitate D.O.J. Intervention) - 21 Pages

~~MOTION DENIED
DATE: 5-   -15
PC~~

#②. Inmate Request To Prison Mailroom Requesting Verification above said motion was mailed out and left this unit on 03-30-15 to States Attorney - ADA Andréa Jacobs - Simultaneously with a motion entitled "Habeas Corpus Applicant's Formal Request For An Investigation In Matters Regarding This Cause" which reached it's destination and was implemented into the record forwarded to the CCA, while the other, i.e., the "Motion Requesting the State Waive It's Exhaustion Requirements" apparently disappeared, and therefore withheld from the record provided the CCA.

#③. Inmate Request To Prison Mailroom Requesting verification the applicant's (2 page) "Motion For Evidentiary Hearing" affirmatively left the unit, and the applicant's (18 Page) "Rebuttal To The State's Response H.C. App. Filed In This Cause" (with a copy going to the State's Att.)

## <u>List Of Attachments Cont.</u>

#(4). Proof of "Postal Certification - and Delivery" to the District Attorney Sharen Wilson of the applicant's (3 page) letter to her advising her she could fully anticipate some degree of Hanky Panky from her underlings regarding the H.C. Writ filed in this cause. Received March 12, 2015.

#(5). The Actual (3 page) Pro se Letter Itself (Drafted March 01, 2015).

Attachment
1                Cause No. C-371-010404-1274592-A

| | |
|---|---|
| Ex Parte | x In The 371st Judicial |
| | x District Court Of |
| Stephen Andrew Hall | x Tarrant County Texas |

Motion For State's Waiver Of Their

Exhaustion Requirement

To The Honorable Judge Of Said Court:

Comes now, Stephen Andrew Hall, Applicant, pro se in the above styled and numbered cause, and asks this honorable Court and the State's Attorney Ms. Andrea Jacobs to consider the prospect of waiving its requirement of exhaustion of State remedies specifically to expedite DOJ intervention in this special "whistle-blower" type case of which distinct claims were made of certain organized criminal activities involving "politically cabal" secretly operating in the Tarrant

(Page-1-of-21 [21] Pages)

● County Courthouse — and will show this hon. Court as follows:

I.

State exhaustion requirements can be waived if the State does so expressly. [AEDPA, Section 104 codified at 28 U.S.C. §2254 (3); Lindh v. Murphy, U.S. ___, ___, 117 S. Ct. 2059, 2067, 138 L. Ed. 481 (1997).]

II.

● On the surface, it may appear the habeas corpus Applicant in this cause is, in essence, trying to present his habeas claims "piecemeal". However, in a case like this, it is of import to see if the responding party, in this case Ms. Andréa Jacobs, will or will not abide by the "Duties Of District Attorneys" mandated in Art. 2.01 and Art. 2.03 of our Texas Code Of Criminal Procedure (Chapter 2), which also define certain duties of the trial Court, which place great emphasis on their duties to protect the rights of the accused based on the presumption of innocence.

(Page 2 — of — 21 Pages)

# III.

I would add that though our Administrative (watchdog) Agencies in Austin have a propensity to shield potential errant and rogue professionals from due accountability until the point where the media sticks a microphone up to their face, they will none-the-less step up to the plate if and when it becomes inevitable they have to "or else". As they recently did in the Cameron Todd Willingham case, where they "finally" formally accused a former Navarro County Prosecutor, i.e., a Mr. John H. Jackson, of misconduct for failing to disclose evidence that tended to negate Mr. Willingham's innocence — whom had maintained his innocence to the point of death. Much in the same way the Applicant has before, during and after his "fixed" sham-trial with it's orchestrated guilty verdict, only in the instant case it moreso pertains to his "actual innocence" according to the letter of the law. And was similarly deprived of a fair and just trial, i.e., "my day in court" due to the trial Court Judge "secreting witnesses"

(Page 3 - of -21 Pages)

capable of establishing the innocence of the accused". (See Art. 2.01, C.C.P.)

I suspect, Ms. Jacobs, you have been made a "figurehead", along with Ms. Patricia Hatley, your deputy Crim. Dist. Attorney, and/or a patsy for others — whom are actually at the helm of a mass "coverup effort" of a much larger criminal scheme. And I am simply advising you to look before you leap in this matter, since you could be making yourself an accomplice to something you may or may not want to be a part of.

## IV.

The Applicant has made it quite clear that DOJ intervention via a "special inquiry" was the primary objective of his habeas plea, but only because it is the only available means. This is not your stereo-typical case where a convicted criminal is attempting to evade justice Ms. Jacobs. And I am simply asking you to do what you are required to do according to the aforementioned statutory description of your

## (IV Cont.)

duties, which is not to impede justice in this cause, step aside and out of the way if you are not going to lead this case in the right direction, waive State exhaustion requirements, and let this Applicant proceed to a Federal jurisdiction where justice can prevail for all. Keeping in mind Ms. Jacobs, there may be more "Cameron Todd Willinghams" and/or "Michael Mortons" and "Timothy Coles" involved in this matter that you are not aware of. And the time to "state your position" is now. Moreover, feel not alone Ms. Jacobs because the Hon. Judge Westfall and the also Hon. Sheren Wilson i.e, your superiors, were essentially also asked to "state their position" in separate pleadings similar to this one that will be mailed out simultaneously.

## V.

## RECOMMENDED COURSE OF ACTION:

The Applicant in this cause urges you to

conduct a conference with Ms. Wilson, the lead Prosecutor and 2nd Chair Prosecutors that were assigned to this case initially, Ms. Erin W. Coler and Mr. Keith Harris, respectfully, to discuss the "trial Court error negation" that Mr. William H. "Billy" Ray "wrote into" the Reporter's Record in this cause at Volume 10, Pages 210-215, in light of the one "sworn affidavit" a witness to that trial proceeding has provided for your office.

Then, once it has been ascertained with exact and absolute certitude that said "fictitious passage of text" "is not" but a long series of inaccuracies, but instead is in fact and indeed what it is, i.e., a cunning, cleverly improvised "negation" of a potentially reversible trial Court error that Ray invented in his protection of a District Court Judge that plays a major role in his extortion and racketeering schemes) or indigents, I would then ask that a reconsideration be made of all of the allegations raised in this cause

for their real and true merit, instead of the cursory - summary dismissal they received initially, since there are some far reaching implications buried in those claims that not only warrant, but scream out for very prompt and very serious attention from your office without further delay. Or, in the alternative, at least allow justice to be sought at a higher level of adjudi- cation without your office becoming an obstruction to that justice.

The Applicant thoroughly realizes it is also your duty to serve and protect the people of Tarrant County to the best of your ability Ms. Jacobs. I honor that. But in doing so, you cannot and must not turn your back on all the potential indigent victims at issue herein — nor can you follow suit in complicity with Ray's other accomplices by trying to "look the other way" in this matter in violation of the aforementioned "duties of office" you are bound by.

As canvassed in the lengthy "Summary of The Facts" I presented in the MOL of my habeas application, that particular fraudulent "negation of a trial Court error" is but one of many just like it. With a special emphasis on the "special inquiry" Ray wrote into the record at Volume 9, Page 145, Line 9 —through— to Page 148, Line 16.

If you will note, the following morning at the 2nd day of trial, only two witnesses were present and accounted for, and were sworn in as per the record. My two elderly sisters whom you couldn't beat away with a stick. (See Vol. 10, P. 10, L. 15 through Vol. 10, P. 11, L. 6.) Which ultimately makes all the alleged incorrect information P.I. Clifford Ginn supposedly (was not sworn in to) volunteered to the Court men-dations. With said secret, private, obviously fictitious special inquiry never being mentioned by the Court until you get to V. 10, P. 137, L. 1-3. Even though the Court and I "duked it out" over the "witness stonewalling issue" all morning with neither the Court or Ginn ever once

● "ever" making a single reference to said alleged prior inquiry.

The mens rea factor here Ms. Jacobs is the "negation of yet another trial court error" with this particular negation pertaining to my continuous, almost incessant requests for a "continuance due to missing witnesses" and the (continuance) denial of my right to compulsory process.

NOTE: (I included the wrong argument)

You were exactly correct in saying the Applicant in this cause failed to argue this point in his habeas app. And I will add that to this motion to show you why I could not argue my 29 grounds of trial court error. The "word count" in this special whistleblower case would double — if not triple. Perhaps it will offer some insight into the complexities I have encountered in my plight seeking DOJ intervention in this cause, and for my plight for justice period.

● Said attached five pages canvass the factual argument only. Thus you could have realistically anticipated an additional 300 to 400 more words if the "legal" argument were added.

## APPLICANT'S GROUND OF ERROR NUMBER FIVE

Applicant was denied his 6th Amendment right to compulsory process for obtaining witnesses in his favor.

The Trial Court engaged in, aided and abetted, and promoted the advancement of organized crime throughout the handling of this case, but especially throughout the trial. There is of course unequivocal, undeniable – indisputable proof – and it is in the record; so no, we cannot ignore it in an attempt to protect Judge Westfall from accountability.

With William H. "Billy" Ray, i.e., the Courts guilty plea enforcement officer, effectuating, organizing and coordinating all criminal activities in proxy hiding behind the curtains like that Grand Ole Wizard of Oz himself, the Court became directly immersed in a <u>Defense witness stonewalling scheme</u> with Ray and his henchmen ( Puppet P.I.'s they paid with honorarium money funded by our Tarrant Co taxpayers) in a crusade to keep all witnesses for the Defense away from the trial, long enough – to race to a guilty verdict, while deriding their targeted indigent victim all along the way in reprisal for his refusing to plead guilty to please the Court.

After coming to the realization what the Court and Mr. Ray were trying to do with their stonewalling scheme, the Applicant tried to go around them by pursuing his own witness contact info – even though $2,500.00 was paid out in honorarium subsidies to three "<u>investigative assistants</u>" to get said contact information for him,

[ See *C,R,, P. 62; C.R., P. 440; C.R., P. 471-477; C.R., 552-561; C.R., P. 517-528; C.R., P. 775; C.R., P. 471-477; C.R., P. 211, P 378 and P. 583; C.R., P. 138; C.R., P. 319, P. 776, P. 808, and P. 813; C.R., P. 666-668.*]

[ See R.R., V. 5, P. 6, L. 15 / V. 6, P. 24, L. 1-5 / V. 6, P. 39, L. 19-25 / V. 9, P. 123, L. 4--11 / V. 9, P. 123, L. 14-21 / V. 9, P. 129, L. 1-14 / V. 9, P. 138, L. 16-17 / V. 10, P. 28, L. 3-12 /V. 10. P. 32, L. 2-3 / V. 10, P. 33, L. 12-14 / V. 4, P. 16, L. 16 /V. 10, P. 39, L. 19-25 – P. 40, L. 25 / V. 10, P. 42, L. 16-18 / V. 9, P. 128, L. 1-3 / V. 9, P. 139, L. 8-18 / V. 10, P. 26, L. 24 ]

Thus, the Applicant subpoenaed a "<u>tenant list</u>" from his landlords Mr. & Mrs. Marvin and Jan Young, owners, operators and managers of the RV Park to the Applicant was leasing from for his RV at the time of arrest.

Said tenant list not only had the names and current mailing addresses for several of his most vital defense witnesses on it, i.e., all contact information for each, needed for subpoenas but also had the "<u>Emergency Contact Information</u>" for

each of those tenants next of kin.   With the point being, the most vital witness the Defense had planned to put on to prove his "Involuntary Act" defense theory

was a Grand-daughter of one of the tenants named Ms. Debbie Parks who lived in Bedford, Texas, some 30 minutes away from the Trial Court.

So the game of Keep Away began with said tenant list – once it was subpoenaed And Mr. & Mrs. Young delivered it in person in open court on March 23, 2012. [ R.R., V. 6, P. 22, L. 6 and P. 23, L. 1]

There was a massive cover-up in the Reporter's Records about all of this by Mr. Ray in his attempts to protect his cohort judge, i.e., the trial court Judge at issue herein, because said Judge "pocketed" said contact information tenant list, secreting it away from the Applicant to help her guilty plea enforcement officer Mr. Ray with his Puppet P.I.'s in their defense witness stonewalling initiatives, and more importantly – bar their targeted indigent victim from being able to prove his actual innocence at trial.   This is of course in violation of "The Rules of Court" and "The Canons of Judicial Conduct " as well as the "Prosecutorial Rules" described in Article 2.01 of or C.C.P. reminding the reviewing Court that the legal term conduct includes acts of omission, and especially acts of omission that can certainly be directly linked to the exclusion of exculpatory evidence.

If you will note at R.R., V. 10, P. 39, L. 21-23 the Applicant confronted the Court over the said tenant list they were keeping from him.   [ See also C.R., P. 448-449 where the Applicant even pleaded with the District Clerk's Office to no avail. ]   Half way through trial the Court was still refusing to allow the Applicant to have access to his subpoenaed witness contact info because the Court was bent on "FIXING" the trial by blocking all evidence that would clearly prove substantively the Applicant was actually innocent due to automatism caused by hypoglycemia.

The Court knew via ex parte communications with Ray and their Puppet P.I.'S as a result of their witch hunts and witness vexing that Mrs Parks and another person on the list named Ray Vaughn not only could have, but certainly would have bolstered the case single handedly  without any other witnesses.   Because they witnessed enough (either or both) to convince any jury that the Applicant was suffering from both halves of two part defense theory of automatism vs an involuntary act.   [ See C.R., P. 568-575; C.R., P. 938, keeping in mind Ray stold pages 2 & 3 of said 3 page Jury Instruction; R.R., V. 11, P. 179. L. 22 / P. 188, L. 4; Ray's sabotaging of the record on those 10 pages is so ludicrous it makes you wonder how Ray thought he could get away with wasthis case in point destruction of the Reporter's Records.   This is not an isolated case though – the entire R.R. is like that ]    [ C.R., P. 138; C.R., P. 776; C.R., P. 775 ]

(Note)
Not how much effort Ray puts out altering the record from  R.R., V. 10, P. 39, L. 24 and R.R., P. 40, L. 10 – in his devious efforts to make it look like the Court gave me said tenant list right there and right then, after reading a list of 19 names from a

tenant list of an RV Park next door to the Applicant's RV Park. (Mr. & Mrs. Young own both parks) but this of course never happened. I have never heard of any of the names Mr. Ray said the Court read aloud. And you will never get Judge Westfall to agree she did read said list aloud in open Court.

Moreover, give me a polygraph and I will prove unequivocally I <u>STILL</u> to this day have never seen or touched that tenant list that Ray put in the record that the Judge gave it to me that day.

To exemplify just how <u>goofy</u> Mr. Ray is with all his fictitious <u>appellate brief rebuttal seeds</u> he plants throughout a totally and absolute rewritten Statement of Facts that he fixes up for his cohort judges and other cohorts in crime, look at <u>R.R., V. 10, P. 42, L. 16-19</u> where Ray tries to actually verify the Judge handed over said tenant list with a fictitious excerpt. It's kind of neat the way he does this throughout a record, keeping in mind the Judge still refused to give Applicant his subpoenaed tenant list even halfway through the trial. Even if said Judge would put her career and liberty on the line to protect Ray on all the alterations in the record, a polygraph would still prove beyond any reasonable that both are in fact and indeed mendacious.

At the end of the day, nothing can change the fact that Judge Westfall was handed a piece of paper <u>with</u> the Defense's witness contact info on it. All the malarkey we read in the record of the Courts puppet P.I.'s not being able to locate and/or make contact with Mr. Parks and Mr. Vaughn for two months leading up to trial (from 03-23-12 when court unlawfully confiscated my subpoenaed witness contact info – until 05-14-12 when trial began), is exactly that – i.e., a bunch of malarkey. [ *R.R., V. 10, P. 22-35.* ]

The Court and Mr. Ray also engaged in stonewalling schemes with two other witnesses that could have single handedly bolstered the Defense's case in proving an '<u>Involuntary Act</u>', i.e., two Fort Worth Police Officers ( one a detective ) that baby set the Applicant for 3 ½ hours when he was suffering from <u>ambulatory automatism</u> two days prior to the offense (afternoon of 7-19-12 –vs- approximately 12:50 pm on 7-22-12 – some 61 hours apart) with it periodically being mentioned in the record how things only got worse during that timeframe. [ See *Defense Exhibit #7, R.R., V. 13 and V. 14* Ray hid but it's in there. ] Namely, Officer G. Medrano and Detective R. E. Stewart. [ See *R.R., V. 6, P. 30-31.* ]

(that's  
aim)

First, Ray and one of their puppet P.I.'s altered a subpoena for Officer Medrano [ See *original handcrafted Subpoena at C.R., P. 330* where P.I. Stanley Keeton implemented the words '*Personnel file of G. Medrano Badge #2233 –vs- C.R., P. 313, the same subpoena after issuance ]* [ See *R.R., V. 6, P. 36, L. 20-21.* ]

This of course brought a City of Fort Worth Attorney Mr. Benjamin Sampract

running to block my subpoena. A personnel file contains very private and personal information about the officers' wife and children, where they attend school, how many push- ups Medrano could do during his last physical etc. As the reviewing court can see, Mr. Ray is very devious minded in the way he thinks. The act gave the trial Court all the justification it needed to quash the Applicant's subpoena for Officer Medrano. Detective Stewart was excused from the bench twice, just for funzies. More deriding the targeted indigent victim. Rubbing it in what a fool he was to expect a fair trial in the 371st District Court after refusing to plead guilty to please the Court.

Please look at _R.R., V. 5, P. 7, L. 10 through P. 9, L. 19_. A reviewing Court will see Ray's puppet P.I. Stanley Keeton blatantly lying to a visiting Judge Honorable Cheyenne Minick about him stonewalling a witness for the Defense named Dr. John Mills. This is a witness a child could find if you showed him where the elevator was in the County Jail and told him the medical department was on the 5th floor. As you can see by the record, Mr. Keeton swears under oath at _R.R., V. 5, P. 8, L. 15-16_ he could find the doctor if he only had the Doctor's name.

At _R.R., V. 5, P. 9, L. 2-19_, you will note the Applicant swearing he provided said name of doctor to said P.I. So, someone is lying under oath, right? This was on 03-19-12.

In _C.R., P. 312_, we will find a Subpoena that was issued exactly ten days earlier on 03-09-12 that is signed by Keeton ( remembering the pre-trial hearing at issue herein occurred on 03-19-2012) that clearly shows Keeton was indeed fully aware of Dr. Mills full name and address the whole time he was lying under oath. He smiled at me the whole time he was doing this, 'deriding' a victim.

The reviewing Court would never believe how far these guys went out of their way to make Mr. Ray and his cohort Judge proud of them for their stonewalling antics.

Did the Court put them up to this? See _R.R., V. 9, P. 128, L. 1-3_, where Judge Westfall explains that the P.I.'s either do what the Court tells them to do or they don't get any more work from the Court. In other words, if their puppet P.I.'s do a good job helping the Court and Mr. Ray with their stonewalling objectives on this case, there is more honorarium money where this came from futuristically.

How did Mr. Ray plan to justify all of this deliberate defense witness stonewalling in his efforts to protect Judge Westfall, i.e, his cohort Judge and his meal ticket in his racketeering and self-enrichment schemes he is running on our indigents of Tarrant County?

In _R.R., V. 9, P. 145-148_ you will see some of Ray's finest work. This is called

(Page 13 - of - 21 Pages)

## GROUND NUMBER FIVE CONTINUED

'simulating a legal process' in the Penal Code.   This is where Judge Westfall has to make a life changing decision to either gamble with her tribunal and her license to practice law by backing Mr. Ray on this   -OR-   be honest and say she is not with Ray on this one.   Applicant cannot wait to see which way she inevitably decides to go.

Ray attached the said 3 ½ pages to the end of a volume in the record, so he could purge it later, after his victim, the Applicant, filed his Appellate Brief on his direct appeal – of which of course never happened because I refused to file such brief based upon the bizarre fictitious Statement of Facts.

I, instead, hastily had copies made to secure evidence to bring Ray to justice with.   Since that plan fell through for Ray, now he will just have to deal with the consequences as best he can – and I'm sure he has been exploiting his best manipulative powers on Judge Westfall and P.I. Clifford Wayne Ginn, getting them prepped for a showdown.

What we see here is a 'Fake Inquiry' that never happened, that Ray improvised and wrote into the record to make it look like Judge Westfall wasn't in on Ray's and Ginn's stonewalling schemes.   Ray had already lost one Judge/meal ticket over his indigent schemes and didn't want to lose another.   They are too hard to mentor and indoctrinate.   Applicant will not elaborate any further on this issue so as not to show his hand to his opponents.   Applicant will state for the record he has composed an 89 page report on a lot of these issues, and, have put together a 100 page booklet just on the 'witness stonewalling' issue and topic alone.   What Applicant has disclosed to the reviewing Court in this Habeas Corpus application, barely scratches the surface.

Nevertheless, with over twenty grounds yet to canvass in this 'Memorandum of Law', this ground has to stop here.   For the record, the Defense started out with only a list of 18 witnesses.   This was all he needed to prove his innocence beyond a reasonable doubt, however, once he encountered widespread corruption and organized crime in his trial Court, that list changed to 50 plus. Applicant had to vacate his original defense against a simple DWI and start undertaking initiatives of proving said corruption and organized crime, inevitably becoming very successful, and is now ready for said showdown, but it must happen in a Federal Forum, where my witness affidavits and discovery through depositions is entirely allowable and even encouraged.   Since Federal Judges actually care about justice and the truth.

209

but you knew he was intoxicated and you didn't really want him around then?

A. We don't -- we don't keep liquor. We don't drink. I mean, we might have a glass of wine with a supper, a meal, when we go out to eat or something like that. We're not drinkers like that. So we don't allow it at our house. When he'd come over in that state of mind, I could tolerate it for a little bit and then ask him to leave if it was too bad.

Q. Okay. And "too bad," obviously intoxicated? And then too bad being too bad, you didn't feel comfortable being around him or at least want your grandchildren around him?

A. It would have been anybody. I don't like to be around people like --

Q. Okay. And when you would tell him to leave, I guess, would he get in his truck and drive?

A. Or he would have somebody out -- if it -- he'd pay people to drive him. If he knew -- now, I say that. This last couple of years, I guess, or year, he learned that lesson, and he'd pay people to drive him, if he was going to drink.

Q. Okay.

A. If he wasn't, if he was working during the day, then he'd get his job done and say, "I'm ready for

210

a beer, so I'm going to go home." But prior to that, --

Q. Okay.

A. -- yeah.

Q. Fair to say it kind of took him a little while to learn that lesson?

A. Yes, it did.

Q. Okay. Now --

MR. HARRIS: Judge, I just have one other question, but I think we have to approach the issue with you before.

THE COURT: We're going to have to take a brief recess.

(OPEN COURT, DEFENDANT PRESENT, JURY NOT PRESENT:)

THE COURT: You may proceed.

MR. HARRIS: Judge, the Defendant, Mr. Hall, during his direct examination of this witness had specifically asked a question of her knowledge as to -- that she's never known him to hurt anyone. The Defendant has been to prison, and we have a certified prior -- well, pen pack conviction of the Defendant being convicted of aggravated robbery, and I think that since he's now made that an issue, that I should at least be able to impeach or question this witness about her knowledge as to that, leaving an impression -- it

211

would leave a false impression based off of the testimony of the question that he's asked.

THE COURT: Mr. Hall, response.

MR. HALL: We're talking about -- I asked her if I've ever physically harmed anybody. I don't care if I had an armory on my person, this was -- see, when you start getting off into old cases, this McDougal robbed a restaurant. I'm present. I'm going to be John Wayne. I take the rap. You start getting into stuff that if you knew the details, I'm not a bad guy.

THE COURT: The problem is that you don't get to go into the details.

MR. HALL: Right.

THE COURT: You're not allowed to leave a false impression with the jury that you've never harmed anyone, and I don't think that anyone would say that aggravated robbery is -- does not cause harm to people who are victims of it.

MR. HALL: That's why I said "physical."

THE COURT: So the problem is that you've left a false impression with the jury.

MR. HALL: Well, Your Honor, there's a lot of people out there who drink and drive.

THE COURT: Well, I understand, and we're not talking about them. We're talking about --

212

MR. HALL: Well, they kill people.

THE COURT: -- whether you leave a false impression with the jury.

MR. HALL: Well, they kill people. I don't. I'm 59 years old.

THE COURT: Well, I'm going to allow the prosecution to question the witness about that one issue.

MR. HALL: She needs to be advised that you do not discuss extraneous offenses.

THE COURT: That's incorrect, sir. She's on the witness stand, and she'll answer truthfully whatever questions she's asked.

Both sides ready for the jury?

MR. HARRIS: State's ready, Your Honor.

MR. HALL: I object, but that don't matter, right?

THE COURT: I'm overruling your objection.

Bring in the jury, please.

(OPEN COURT, DEFENDANT AND PARTIAL JURY PRESENT:)

THE COURT: You may be seated.

State may proceed.

JUROR: Still have one more.

Pg 15 of 21

213

THE COURT: Oh, one more. Aha.

(OPEN COURT, DEFENDANT AND FULL JURY PRESENT:)

Q. (BY MR. HARRIS:) Ms. Goforth, you said you had a call from a woman who said Stephen had a couple of beers; is that correct?

A. Yes.

Q. So it was your understanding he had been drinking, had a couple of beers, correct?

A. Yes.

Q. And that was something he had done. She didn't say anything about her giving him anything, anything like that. She said he had a couple of beers, correct?

A. You mean like were they both drinking?

Q. Based off of what she told you, Steve — excuse me — Stephen Hall had a couple of beers and was going to stay there; is that true?

A. Yes.

MR. HALL: I object, Your Honor. He can lead the witnesses on; I can't?

THE COURT: Correct.

Q. (BY MR. HARRIS:) Okay. And one other thing. Earlier, Mr. Hall had asked you a question, he had never hurt anyone, and you answered, yes, that's correct, you

214

had never known him to hurt anyone; is that true?

A. Yes, but — that's true. When you asked the question — or when he asked the question, I thought he meant in regards to drinking. Steve has never hurt anybody.

Q. Okay.

MR. HALL: I object, Your Honor.

THE COURT: That objection is overruled.

MR. HALL: You don't even know what I'm objecting to.

THE COURT: Yes, I do.

MR. HALL: All right.

Q. (BY MR. HARRIS:) Now, the way that he had phrased it, it wasn't whether or not he had hurt anyone drinking or anything like that. He just said — he asked you the question, "He was never known to hurt anyone," and you said that was correct or you had never known him to hurt anyone?

A. Right.

Q. Now, you are aware that on August 15th, 1978, that Mr. Hall was convicted of aggravated robbery. Were you aware of that?

A. Yes, I was.

Q. Okay. With that conviction — being convicted of an offense of aggravated robbery, does that

215

change your opinion on whether or not — your opinion as to whether or not he would hurt anyone?

A. No. He — there is no excuse. There is an excuse, but he was —

Q. And I'm not asking about the —

A. — in his twenties, and he didn't hurt anybody. He was trying to hurt himself, I think.

Q. Okay. And I'm not asking about the facts of that case, but just as to your knowledge of that conviction for aggravated robbery, that wouldn't change your opinion as to the answer that you gave?

A. No.

MR. HARRIS: I don't have any further questions of this witness.

MR. HALL: Your Honor, for the record, I want to make a very conscious verdict objecting to that. He has taken, "Have I ever physically hurt anybody," and blown it plumb out of context, a robbery about a girl.

THE BAILIFF: Sit down.

MR. HALL: Huh?

THE COURT: Mr. Hall, sit down.

MR. HALL: It's on the indictment. The girl robbed —

MR. HARRIS: Your Honor, I'm going to object. He's going into the facts. If he has an

216

objection, I'm fine with that, but if he's going to testify as to facts of that conviction —

THE COURT: That's sustained.

MR. HALL: Anyway, for the record, I'm going to go right back to the physical. I pleaded nolo contendere because they suggested I scared anybody. I didn't —

MR. HARRIS: I'm going to object to the testifying.

THE COURT: Sustained.

Do you have a question, Mr. Hall?

MR. HALL: Does she have the right to — I mean, I can see how this is all going to — the way they're keeping the jury out of the — out while they're — while — the way y'all get your dirty work done. Is this going to happen with every witness?

I mean, basically, y'all won't let me testify anything good about myself. You ask anybody that knows me, and I will get up, I will take everybody that's on the stand —

THE COURT: Okay. Mr. Hall, this is a question and answer format. Do you have a question?

MR. HALL: Yes, I do, Your Honor. It's just for her, not for you, right? Okay.

Q. (BY MR. HALL:) Do you know what the Fifth

Pg 16 of 21

shown.

THE COURT: And I would agree with you, that they shouldn't go into your prior criminal history and prejudice this jury.

MR. HALL: The way -- I think the way they describe it, an officer should know, if he asks you questions like that, what -- what could come back as an answer.

THE COURT: We have ways of taking care of that outside of what the officer says.

MR. HALL: I believe that's all the issues.

THE COURT: Okay.

MR. HALL: I mean, I still need to talk to Mr. Walker if at all possible.

THE COURT: Well, the sooner you get back -- I mean, I want you to talk to Mr. Walker, but the sooner you get back to your housing, the sooner you'll have access to the law library and probably the greater access you'll have. So just bear that in mind, that it is a balancing act, that the more time you spend here, the less time you'll have there.

MR. HALL: Okay. I'd like to have your opinion on this, too, Your Honor, because I haven't talked to him yet, and he might not want to be involved

with it either. That's what I want to talk to him about it. But being that I'm not going to be able to use my -- from what it looks like, that -- I mean, I'll confirm that when I do my research after while -- my automatism defense, then I guess it matters not what happens during this trial. So, I mean, if Mr. Walker wanted to step in and do whatever he -- do whatever.

THE COURT: Do whatever? Now I'm not sure what you're asking me.

MR. HALL: Well, I mean, you didn't want him to -- you gave me the option either that I give him the whole run of the show or none of it, I mean, where I can't be involved. So the question is: Is that offer still good to where he can just take over the defense and do what attorneys do?

THE COURT: Well, I mean, that's something that you -- you can waive your right to self-representation at this point. It's your right, and it's your right to waive. I don't know if Mr. Walker is willing to do that or not. That's completely up to him. And the only thing that I have told you and Mr. Walker throughout this trial is that there's no such thing as hybrid representation and I won't allow it. It's either an attorney or it's self-representation, and there's no meet in the middle. There's no middle road between

those two things. And that's what the law says. So if you want to talk to Mr. Walker, you're certainly free to.

MR. HALL: It looks like the ball's in his court, and we'll leave that up to him. The family didn't pay him very much, so I would understand if he didn't want to do it.

THE COURT: He doesn't have a lot of time to prepare at this point.

MR. WALKER: And, Your Honor, if I could go ahead and be on the record and just kind of identify myself so everyone knows who I am. And this is what I've been retained by his family to do. I was asked at this juncture to help him as much as possible, to look over his theory, his paperwork, his research, to give him an idea of, you know, bettering that theory, to be a witness to the trial, sit in in the proceedings, to give him advice during the breaks. At this point that's what I've been doing.

I will talk to him after we get done here today about the potential of me converting my representation to actually litigating this case. I would not have a lot of time to prepare, that is correct, and that's something I'll discuss with him later on tonight.

THE COURT: There's nothing further from either side? State?

MS. COFER: The State does not have anything further, Your Honor.

THE COURT: Defense?

MR. HALL: No, Your Honor.

THE COURT: Okay. We're going to stand in recess for tonight. 9:00 tomorrow.

(Recess from 4:24 p.m. to 4:30 p.m.)

(CLOSED COURT, DEFENDANT AND JURY NOT PRESENT:)

THE COURT: Mr. Hall has asked me to inquire, and in response to that, I am. He claims he has multiple civilian witnesses who live right around where he lived before he was arrested who are very key witnesses to this case. He says that he's going to need a continuance if they're not placed under subpoena. Of course, I don't know anything about their materiality, but what -- what success have you had in getting these people under subpoena?

MR. GINN: These -- Your Honor, he resided in a trailer park. It was a gypsy-like environment. A lot of these people have disappeared and vacated.

I had to take three of my men out today

to a previously sworn-in witness that was running around the trailer park hiding from us. We had to take -- I took three of my men out there. We finally had to corner this witness and serve him another subpoena. He's already been subpoenaed, but I had uncovered his correct name. He was subpoenaed under an a/k/a, an alias. And prior, before I uncovered his correct name, issued a subpoena. They ran from us today. And one of my men and then myself and another one of my men went out there, and we surrounded the trailer park to get this witness to be compliant, to come in today. I had to have a very stern conversation with him about the rules of the Court.

We -- I've canvassed the park. Other -- my other investigators canvassed the park for these people, and either they're lying to us or they're not really there.

But the key witnesses I feel for his case that he has told me to key on, we're getting those. And I'm currently making him up a list. I was in the process of making him up a list. Mr. Woodrich is following me with all of our subpoenas and all of our lists.

I've contacted his family members that he needs. They're all contacted.

We're serving subpoenas on everybody we need to serve. It's just that to compile the list for him and to give him all of the returns is taking the better part of the day and into the evening.

THE COURT: How many subpoenas are we talking about?

MR. GINN: Your Honor, there's about 25 or so subpoenas, and so that's about what I'm talking about. And those were all issued -- he originally issued them without a date, and the clerk had to reissue all those subpoenas. Then I got them all at 5:00 on Friday, and so we've spent the weekend serving them.

I feel confident he will have enough witnesses for his case, and he will -- tonight, I plan on meeting with him in jail and giving him a current updated list, returns, filing returns in the morning, supplying him with all those in time.

Had he have given us more notice on the witness list -- and I didn't know there would be a recusal hearing this morning. I thought we would start voir dire, I mean, and then trial this afternoon, so...

THE COURT: Well, I expect, based on what the State has said, that defense case will start tomorrow afternoon sometime.

MR. GINN: And I've got my witnesses lined up in the morning to show up and be sworn in.

THE COURT: Okay. Very good.

MR. GINN: And they're all his people. And I can go back and talk to him about that and explain that to him right now so he's a little more comfortable. But just with that many people to contact and make the list and do all that, I have three people out working on it and will be working into the night getting his list ready --

THE COURT: Okay.

MR. GINN: -- and so complying with everything he needs for his defense.

THE COURT: Okay. Very good. Thank you, Mr. Ginn.

MR. GINN: Okay. Thank you, Your Honor.

(Proceedings concluded at 4:36 p.m.)

## VI.

The Applicant in this cause, unfortunately, is at a great disadvantage financially.

And must with deep regret inform you Ms. Jacobs that I only possess enough postage to forward this one copy only of this motion, and therefore must ask you if you can possibly make you a copy of this pleading for your own file, and perhaps as a jesture of kindness forward the original on to the 371st District Court to Judge Westfall, so that it may be factored in with her (the Court's) proposed findings of facts and Conclusions of Law when she addresses this application.

If you could, this would of course be greatly appreciated since you would be contributing to a good cause.

- Conclusion / Prayer -

Wherefore, premises considered, I, the movant prays this plea for a States Waiver of Their Exhaustion Requirements be seriously considered in the interests of justice for the sake of

(Page 19 - of - 21 ) Pages)

justice, so that justice may prevail for all.

Respectfully Submitted

Stephen Andrew Hall

Stephen Andrew Hall
TDC# 1787103
Boyd Unit
200 Spur 113
Teague, Texas 75860

Cause No. C-371-010404-1274592-A

## Verification of Unsworn Declaration

I, Stephen A. Hall Applicant Defendant pro se in this cause, state the following under penalty of perjury: I am a

prisoner, # 1787103, currently incarcerated in the ~~Tarrant County Jail in Tarrant~~ TDCJ at the Boyd Unit in Freestone County, Texas. I am

duly qualified and authorized in all respects to make this declaration. I have read the foregoing 121 Page Motion For State Waiver Of Their Exhaustion Requirement

and declare that I have personal knowledge of the facts contained therein and said facts are true & correct.

EXECUTED in ~~Tarrant~~ Freestone County, Texas, pursuant to Art. 132.001 et. seq., Texas C.P.R.C and 28 UCSC

§1746, on this 28th day of March 20 15.

Please send original
to the Hon. Judge
Westfall - 371st Dist.
Court - 5th Floor

Thank You!

_(Signature)_ Stephen A. Hall

Stephen Andrew Hall
_(Print Name)_ TDC# 1787103

Applicant
~~Defendant~~ pro se

CID # 0391472 DOB 01/08/53

Address: Boyd Unit
200 Spur 113
Teague, Texas 75860

## CERTIFICATE OF SERVICE

**I hereby certify that a copy of the foregoing motion was mailed to**

Asst. District Att. Andrea Jacobs ___ at
401 West Belknap St, Fort Worth, Texas 76196

regular
by ~~certified mail, return receipt requested,~~ on this the 28th day of
March , 20 15.

_____ Stephen A. Hall

~~Defendant~~
Applicant Pro se

(Page 21 -of - 21 Pages)

- Attachment 2 -

**SUBJECT:** *State briefly the problem on which you desire assistance.* (They should have left here
Mail Room Officer, Monday 03-30-15.)

I had "3" more motions leave here to three different parties that should be logged in on your log book - and I apologize but once again I didn't have the amount of postage necessary to send them out certified. Thus, can you please verify they were logged out for me. ① was to to Judge Westfall - the 371st Dist. C ② the second one was to District Att. Sharen Wilson, Tarrant Co ③ the last one was to Ms. Andrea Jacobs - Asst. D.A. of Tarrant Co. Thank Yo

Name: Stephen Andrew Hall    No: 1787103    Unit: Boyd

Living Quarters: ~~E-120-B~~    Work Assignment: Utility Squad 1

**DISPOSITION:** (Inmate will not write in this space)

All three of these were logged on 3-30-15 and sent out the same day.
— D. Hullum

☆I-60 (Rev. 11-90)

---

TEXAS DEPARTMENT OF CRIMINAL JUSTICE — INSTITUTIONAL DIVISION
# INMATE REQUEST TO OFFICIAL

REASON FOR REQUEST: (Please check one)

**PLEASE ABIDE BY THE FOLLOWING CHANNELS OF COMMUNICATION. THIS WILL SAVE TIME, GET YOUR REQUEST TO THE PROPER PERSON, AND GET AN ANSWER TO YOU MORE QUICKLY.**

1. ☐ Unit Assignment, Transfer (Chairman of Classification, Administration Building)

2. ☐ Restoration of Lost overtime (Unit Warden-if approved, it will be forwarded to the State Disciplinary Committee)

3. ☐ Request for Promotion in Class or to Trusty Class (Unit Warden- if approved, will be forwarded to the Director of Classification)

4. ☐ Clemency-Pardon, parole, early out-mandatory supervision (Board of Pardons and Paroles, 8610 Shoal Creek Blvd. Austin, Texas 78757)

5. ☐ Visiting List (Asst. Director of classification, Administration Building)

6. ☐ Parole requirements and related information (Unit Parole Counselor)

7. ☐ Inmate Prison Record (Request for copy of record, information on parole eligibility, discharge date, detainers-Unit Administration)

8. ☐ Personal Interview with a representative of an outside agency (Treatment Division, Administration Building)

TO: Mail Room - Ms. Hullum    DATE: 04-01-15
(Name and title of official)

ADDRESS: Boyd Unit

**SUBJECT:** *State briefly the problem on which you desire assistance.*

Mail Room Officer,

On Friday March 20 and Saturday March 21 I mailed out two legal parcels in large writ envelopes to the 371st District Court of Tarrant Co. Texas and to the D.A.'s Office. Can I please get verification they were logged in and were sent out on Monday the 23rd of March since I didn't have enough postage to send them out certified. Thanks

Name: Stephen Andrew Hall    1787103    Unit: Boyd

Living Quarters: G-120-B      Assignment: Utility Squad 1

**DISPOSITION:** (Inmate will not write in this space)

I show 2 logged out to Dist Court on 3-23-15 and 1 to the DA on 3-23-15 as well.

— M. Hullum

☆I-60 (Rev. 11-90)

---

TEXAS DEPARTMENT C:      INSTITUTIONAL DIVISION

**INMAT**      OFFICIAL

REASON FOR REQUEST: (Please check one)

**PLEASE ABIDE BY THE FOLLOWING CHANNELS OF COMMUNICATION. THIS WILL SAVE TIME, GET YOUR REQUEST TO THE PROPER PERSON, AND GET AN ANSWER TO YOU MORE QUICKLY.**

1. ☐ *Unit Assignment, Transfer (Chairman of Classification, Administration Building)*

2. ☐ *Restoration of Lost overtime (Unit Warden-if approved, it will be forwarded to the State Disciplinary Committee)*

3. ☐ *Request for Promotion in Class or to Trusty Class (Unit Warden- if approved, will be forwarded to the Director of Classification)*

4. ☐ *Clemency-Pardon, parole, early out-mandatory supervision (Board of Pardons and Paroles, 8610 Shoal Creek Blvd. Austin, Texas 78757)*

5. ☐ *Visiting List (Asst. Director of classification, Administration Building)*

6. ☐ *Parole requirements and related information (Unit Parole Counselor)*

7. ☐ *Inmate Prison Record (Request for copy of record, information on parole eligibility, discharge date, detainers-Unit Administration)*

8. ☐ *Personal Interview with a representative of an outside agency (Treatment Division, Administration Building)*

TO: Mail Room — Ms. Hullum      DATE: 3-27-15

*(Name and title of official)*

ADDRESS: Boyd Unit

**- Attachment 4 -**

Note: The "Green Card" showing the date this letter was received by the Hon. Dist. Att. Sharen Wilson says it was received on 3-12-2015, (under the tracking number indicated.)

Stephen A. Hall #01787103
Boyd Unit
200 Spur 113
Teague, Texas 75860



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL**

7014 1200 0001 6641 6339
7014 1200 0001 6641 6339

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

Postage $

Certified Fee

Return Receipt Fee
(Endorsement Required)

Restricted Delivery Fee
(Endorsement Required)

Total Postage & Fees $

Sent To Sharen Wilson, Dist. Attorney
Street, Apt No.; or PO Box No. 401 W. Belknap Street
City, State, ZIP+4 Fort Worth, Texas 76196

Postmark
Here

OFFICIAL USE

Share
rict a
W. Be
Worth

March 01, 2015

To: The Hon. Ms. Sharen Wilson
     District Attorney - Tarrant Co.

                    From: Stephen Andrew Hall
                          TDC #1787103
                          Boyd Unit
                          200 Spur 113
                          Teague, Texas 75860

Dear Ms. Wilson,

          Congradulations on your
election bid and may great changes come to
   the D.A.'s Office with you at the helm.

          Ms. Wilson, I need to ask
you for a very unusual favor if possible.

          On Saturday, Feb. 21st 2015
my family took a Habeas 11.07 application
   I drafted to the Post Office there in
Fort Worth and mailed it First Class Certified
   to the Clerk of the 371st District Court
of the Hon. Judge Westfall.

          Said Habeas app. is
anything but your typical pleading as a legal
   instrument and basically exposes a lot

of hanky panky thats been going on in the Tim Curry Crim. Justice Center -apparently, for some time now that you may or may not be aware of. That matters not.

What does matter is the fact that you will never see more henky panky than that which is expected to be generated by my Habeas app. and you may want to personally oversee it's proper handling.

I also believe said app. could offer you great insight into the backstory -or- the most recent history / of the shady dealings that have been occuring in the Office you have just assumed the leadership role over - if you are even interested, as well as what you will be confronting inevitably in the near future.

In essence, the only thing I am asking from you Ms. Wilson, as our new D.A., and respectfully, is to personally see to it my Habeas app. gets handled properly and appropriately - i.e., legally, minus improper influence from certain negative elements a few of your Dept. Chiefs

have been in association with.

I have met with fierce opposition seeking justice in the Tim Curry Crim. Justice Center — and I am simply trying to make my way to the safety of a Federal jurisdiction where more American — civil — humane type conduct is anticipated, while taking the path of least resistance.

Thank You for your time and consideration.

Very Respectfully Submitted

Stephen A. Hall